## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISON

| | |
|---|---|
| **MICHAEL STELLY, on behalf of himself and all others similarly situated, insert similarly situated.** | **Civil Case No. _____**<br><br>**JUDGE JAMES CAIN** |
| Plaintiff, | **MAGISTRATE JUDGE KAY** |
| vs. | **CLASS ACTION** |
| **STATE FARM FIRE AND CASUALTY INSURANCE COMPANY,** | |
| Defendant. | |

## ORIGINAL COMPLAINT

Plaintiff, **MICHAEL STELLY** ("Plaintiff"), individually and on behalf of all others similarly situated, brings this lawsuit against State Farm Fire and Casualty Insurance Company ("Defendant") for breach of contract, violation of statutory duty to make timely payment, breach of the duty of good faith, unjust enrichment, and for declaratory judgment for Defendant's improper use of artificially low cost estimates to calculate and pay roofing repair costs when adjusting claims by homeowners. Plaintiff's allegations against Defendant are based upon information and belief and upon investigation of Plaintiff's counsel, except for allegations specifically pertaining to Plaintiff, which are based upon Plaintiff's personal knowledge.

## NATURE OF THE ACTION

1.     This class action on behalf of Plaintiff and all other similarly situated homeowners who purchased homeowner's insurance policies sold by Defendant to cover properties in Lousiana, who have made insurance claims for roofing repair pursuant to those policies, and received payment pursuant to those claims, seeks to redress an egregious problem with an automated claims

1

estimation system that substantially underpays and affects all class members. The computer function that gives rise to this action is applied in every roofing repair estimate performed by Defendant using the Xactware software; it is literally set to the incorrect "default setting" causing common underpayments to all class members and insureds as a result.

2.     Upon receipt of claims for roofing repair from Plaintiff and Class Members, Defendant assigns a claim adjuster to the claim to verify the claim and to determine the amount of payment to be made in order to satisfy the claim. These adjusters enter information about the damaged roof into an automated computer estimating program called Xactimate. Insurance companies are not required by law to use the Xactimate program, but they do so for their own convenience.

3.     The Xactimate system assigns a default price for each line item of roofing repair to be undertaken.

4.     For one of the areas of labor costs—removal costs for roofing repairs—the system is set to an erroneous default which does not reflect the actual labor burden for this type of work. For all roofing removal determinations, the Xactimate program uses a default labor cost setting of "demolition", indicated in the system as "DMO." Work categorized as "demolition" within the Xactware system is automatically priced with unskilled labor.

5.     However, given the risks attendant to roofing repair work, workers engaged in such work are classified as "roofers" rather than as demolition or unskilled laborers by workers compensation insurance providers.  This classification as "roofer" brings with it a higher workers compensation premium.  Accordingly, the Xactimate setting that should be used for roofing removal estimates and payments is the removal or "RFG" setting, which reflects the actual labor burden for roofing removal work including the cost of workers' compensation premium charged

for those lawfully engaged in the act of doing roofing work. This rate is higher than that for the DMO setting.

6.    Thus, because Defendant's estimates and payments of roofing repair claims use the costs of work if performed by a demolition crew, Defendant's estimates of homeowners' roofing repair claims (and payments made thereon) are necessarily and, by definition, always below the actual cash value of such repairs, a fact of which Defendant is very much aware.

7.    However, the policies sold by Defendant to Plaintiff and Class Members require that Defendant pay to policyholders for any roofing repair claim covered by the insurance policies the actual cash value ("ACV") of roofing repair work, not the cash value of demolition work. Accordingly, Defendants' purported ACV payments to Plaintiff and Class Members for roofing repair claims are artificially and unlawfully low, deficient and do not represent actual cash value for such work. Yet Defendant, despite knowing this, has not altered its conduct and continues to knowingly provide these improperly deficient payments

8.    As a result, Defendant has breached its contractual obligations to Plaintiff and Class Members, breached its duty of good faith, and has been unjustly enriched in that it has retained and not paid out monies owing to Plaintiff and Class Members.

9.    Plaintiff brings this suit to require Defendant to pay Plaintiff and Class Members the difference between payments made using the improper demolition labor rates and the payment that should have been made had Defendant used the proper roofing labor rates to reflect the actual labor burden for roofing removal work including the cost of workers' compensation premium charged for those lawfully engaged in the act of doing roofing work and as as required by Defendant's insurance contracts with insured. As will be discussed, *infra*, such calculations can be

made within the Xactimate system, by simply replacing the improper demolition (DMO) labor code with the proper roofing (RFG) labor code for roofing removal costs.

## PARTIES

10.     Plaintiff Michael Stelly is a resident of Calcasieu Parish, Louisiana. At all times relevant hereto, Plaintiff has owned the residence located at 4209 E. Jevon Lane, Lake Charles, Louisiana (the "Premises") and has resided at same.  At all times relevant, Plaintiff was the named policyholder of a homeowners insurance policy issued by Defendant, Policy No. 18EN18915 (the "Policy"). A copy of the Policy is attached hereto as Exhibit A. The Policy insured the Premises against property damage, and the term of the Policy was October 22, 2019 through October 22, 2020.

11.     Defendant State Farm Fire and Casualty Company is an insurance company with its principal place of business in Bloomington, Illinois. Defendant is authorized to sell homeowner and property insurance policies in the State of Louisiana and is engaged in the insurance business in the State of Louisiana.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(C) because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and Plaintiff and other putative Class members are citizens of a different state than Defendant.

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1), (b)(2) and 28 U.S.C. § 1391(c)(2) because Defendant is subject to this Court's personal jurisdiction with respect to this action. Defendant is registered to do business in the State of Louisiana and maintains a registered agent for service of process within this District. Defendant has availed itself of the

rights and privileges of conducting business in the State of Louisiana, regularly transacts business within the State, and solicits business from within the State and from individuals residing within the State.

## CLASSWIDE FACTUAL ALLEGATIONS

### The Louisiana Homeowners Insurance Industry Is a Multi-Billion Dollar Market

14.        According to 2019 census data, there are more than two million housing units in Louisiana.[1]  A 2021 Bankrate study of quoted annual premiums notes that: "The average premium for homeowners insurance in Louisiana is $1,813 per year for $250,000 in dwelling coverage . . . which is in line with the surrounding states."[2]

15.     As a result, the homeowners insurance industry in Louisiana is a multi-billion-dollar business.  According to the 2019-2020 Louisiana Department of Insurance ("LDI") Annual Report, almost $2 billion dollars in homeowners multiple peril insurance premiums were written in Louisiana in calendar year 2019.[3]

16.     Defendant, State Farm, is a major participant in this industry.  Indeed, in a May 2018 article in the *Insurance Journal* reporting on the 2018 LDI Agency Snapshot, it was reported that: "The top three homeowners multi-peril insurers in Louisiana are State Farm Fire and Casualty Co. with $487,955,101 in direct written premium and 26.34 percent market share, Allstate Insurance Co. with 100,506,499 in direct written premium and a market share of 5.43 percent, and Louisiana Farm Bureau Mutual Insurance Co. with $93,000,260 in direct written premium and a market share of 5.02 percent."[4]

---

[1] https://www.census.gov/quickfacts/LA
[2] https://www.bankrate.com/insurance/homeowners-insurance/in-louisiana/
[3] https://www.ldi.la.gov/docs/default-source/documents/publicaffairs/annualreports/2019-2020-ldi-annual-report.pdf?sfvrsn=8c534d52_6 at 104.
[4] https://www.insurancejournal.com/news/southcentral/2018/05/15/489260.htm

**Storms and Weather Events And Disasters Have Been Responsible
for Significant Property Damage in Louisiana Throughout the Class Period.**

17.     The magnitude of damage and loss suffered by Louisiana homeowner insurance policy purchasers also is massive. Indeed, the above-referenced LDI Annual Report indicates that in calendar year 2019, for example, there was almost $800 million in direct loss paid (deducting salvage).[5]

18.     This magnitude of loss is unsurprising given the number of billion-dollar weather events impacting Louisiana.  For example, in 2020 alone, Hurricanes Laura, Delta, and Zeta, all struck Louisiana.[6]  And, "Louisiana's position near the Gulf of Mexico makes it very susceptible to hurricanes and severe rainstorms." [7]  Such storms frequently lead to roofing damage to homes in their path.

19.     As of 2020, Louisiana ranked second, behind only Texas, as the state with the most disaster damage per household, with "$1.87 billion statewide annual property damage due to natural disasters."[8] And, "[b]etween 2014 and 2018, disaster damage has cost households $1,078 on average per year."[9]

---

[5] https://www.ldi.la.gov/docs/default-source/documents/publicaffairs/annualreports/2019-2020-ldi-annual-report.pdf?sfvrsn=8c534d52_6 at 104.
[6] https://www.theadvertiser.com/story/weather/2021/01/09/billion-dollar-disasters-us-2020-hurricane-laura-california-wildfires-noaa/6595401002/
[7] https://www.valuepenguin.com/property-insurance/states-most-at-risk-natural-disasters
[8] https://www.valuepenguin.com/property-insurance/states-most-at-risk-natural-disasters
[9] https://www.valuepenguin.com/property-insurance/states-most-at-risk-natural-disasters

**State Farm's Obligation To Pay Covered Claims**

20.     Homeowners insurance is a form of property insurance covering loss or damage to a residence (interior or exterior) as well as to assets in the residence and injury occurring on the covered property.

21.     Under the standard State Farm Homeowners Policy (Ex. B hereto), State Farm contracts to provide coverage for, among other things:

> **COVERAGE A - Dwelling**. **We** cover the **dwelling** and materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration, or repair of the **dwelling** or other structures on the **residence premises**.
>
> **2. Other Structures. We** cover other structures on the **residence premises**, separated from the dwelling by clear space. Structures connected to the **dwelling** by only a fence, utility line, or similar connection are considered to be other structures.

State Farm Homeowners Policy Coverage Sample (Ex. B) at 5 (emphasis in original).  Coverage also is provided for personal property as enumerated in the policy.  *Id.*

22.     Under this policy, with respect to the dwelling, State Farm contracts that until "actual repair or replacement is completed" it will pay the actual cash value or ACV of covered losses.  *See* (Ex. B) at 18 & 19.  ACV is equal to "the value of the damaged part of the property at the time of loss, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation." (Ex. B) at 1.

23.  State Farm further commits that "when the repair or replacement is actually completed," it will "pay the covered additional amount" that the policyholder "actually and necessarily" spends "to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the **Declarations**, whichever is less."  (Ex. B) at 18 & 19 (emphasis in original).  State Farm provides, further that: "to receive any additional payments on

a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed." (Ex. B) at 18 & 19.

## The Claims Adjustment Process

23.     State Farm's homeowner insurance claims adjustment process begins when a policyholder files a claim for property damage.  In response, State Farm assigns a claims adjuster to verify and investigate the claim.  Upon completion of the investigation, the adjuster submits a report to State Farm with an estimate of the repair costs.

24.     In estimating the repair costs, State Farm uses Xactimate, a product developed, made, maintained, and sold and/or licensed for use by Xactware, which is a subsidiary of Verisk Analytics, Inc.

25.     Xactimate is a "software system for estimating the cost of repairs and reconstruction for residential and small commercial structures."[10]   The use of Xactimate in the adjustment process is not required by law.  Rather, it is a tool, the use of which has been adopted by State Farm and other homeowners insurance companies and their adjusters.

26.     As reported by United Policyholders, a 501(c)(3) non-profit organization "whose mission is to be a trustworthy and useful information resource and an effective voice for consumers of all types of insurance in all 50 states,"[11] Xactimate "has become widely used by insurance companies in the past decade."[12]

27.     In utilizing Xactimate, the adjuster enters into the software program the items to be repaired (e.g., roofing) as well as the size of the damaged property, and the Xactimate software

---

[10] https://www.verisk.com/insurance/products/xactimate/
[11] https://uphelp.org/about/
[12] https://uphelp.org/claim-guidance-publications/xactimate-demystified/

generates a report reflecting the costs of each of the repairs.  For each line item of repair, Xactimate provides: (a) labor costs; (b) labor productivity rates (for new construction and restoration); (c) labor burden and overhead; (d) material costs; and (e) equipment costs.[13]  These line-item costs are set at a default price assigned by the Xactimate software.

28.    For one of the areas of labor costs—removal costs for roofing repairs—the system is set to a default labor cost setting of "demolition" (indicated in the system as "DMO").  However, this default DMO setting is erroneously low.

29.    The use of the DMO setting sets the price of roofing repair at a rate as if the work was done by a demolition crew comprised of non-specialized, unskilled laborers.  However, that is incorrect, and it does not reflect how roofing repair work is done.

30.    Roofing repair work does not occur in two phases: demolition undertaken by an unskilled demolition crew of laborers following by repair undertaken by a skilled and insured.

31.    Rather, when licensed and lawfully-operating roofing companies, contractors, and subcontractors perform roofing repair work, the removal of an existing, damaged roof and the installation of the new roofing materials all are undertaken by an insured, skilled labor crew.

32.    The reasons for this are straightforward. Roofing work presents safety risks including risks to workers from laboring at great heights and lifting heavy materials.  There also are risks that may be caused from flawed or faulty work or from mishaps and accidents that may occur regardless of how careful the roofing crew is when undertaking repairs.

33.    Accordingly, the use of skilled and properly insured roofing crews means that any property damage or personal injury caused by the roofing repair work will be covered by the roofing company's liability insurance and/or workers' compensation insurance.

---

[13] https://www.verisk.com/insurance/products/xactimate/

34.     By law, all companies in Louisiana (with a few narrow exceptions not applicable herein) must obtain and maintain workers' compensation insurance, even if they have only one employee and even if that employee is part-time, seasonal, or temporary.

35.     Workers' compensation insurance providers classify any worker on a roof during their occupational duties as a "roofer" rather than as a demolition or unskilled laborer because of the risks inherent in such work. Because of the aforementioned risks inherent in roofing repair work, the workers' compensation premiums for skilled roofing repair workers is higher than for unskilled or demolition workers.

36.     Given this, the proper Xactimate setting for use in estimating and adjusting removal costs for roofing repairs is the RFG setting, which reflects the actual labor burden for this type of work, include the cost of workers' compensation premium charged for those lawfully engaged in the act of doing roofing work.

37.     Despite this, Defendant and its adjusters knowingly persist in using the Xactimate default setting of DMO for removal costs for roofing repairs, which does not reflect the actual labor burden for these costs.  As a result, the estimates and payments made by Defendant to policyholders, such as Plaintiff and the Class members, are lower than actual cash value for the roofing repair work done on their properties.  During the Class period that has led to millions of dollars in underpayments.

**PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS**

38.     In October 2004, Plaintiff purchased a homeowners insurance policy issued by Defendant, and continually renewed the policy through October 2021 (Policy No. 18EN18915) (Ex. A). The Policy provides for insurance coverage for accidental direct physical loss to the dwelling located on the insured Premises, except as specifically excluded or limited by the Policy.

There is no dispute that the claims and repairs at issue in this lawsuit are covered claims, not otherwise excluded by the insureds' policies.

39.     Pursuant to the Policy, Plaintiff paid Defendant an annual premium in exchange for insurance coverage. The required premiums were paid at all times relevant to this Complaint.[14]

40.     On May 27, 2020, Plaintiff's dwelling located on the insured Premises suffered storm damage. This damage included: severe damage to the entire roof, gutters, window screens, downspouts, drip edges, roof vents, flashing and chimney flashing (the "Roofing Loss").

41.     The Policy was in effect at the time of the Roofing Loss, and the Roofing Loss is compensable under the terms of the Policy. As it relates to the Roofing Loss, there is no applicable exclusion.

42.     On or about June 5, 2020, Plaintiff notified Defendant of the damage to his dwelling (including the Roofing Loss), and made a claim against the Policy.

43.     On June 10, 2020, Defendant inspected the property and assigned a claims adjuster to assess the damage to Plaintiff's dwelling (including the Roofing Loss).

44.     After its inspection, Defendant determined that the damage to Plaintiff's dwelling (including the Roofing Loss) was covered by the terms of the Policy.

45.     Via a letter dated June 17, 2020, Defendant informed Plaintiff that it was paying Plaintiff's claim, including the costs of repair for the Roofing Loss. The letter sent by Defendant to Plaintiff is attached hereto as Exhibit C. In adjusting Plaintiff's claim, Defendant's adjuster utilized the Xactimate software.

46.     The letter states in relevant part as follows:

"The estimate to repair or replace your damaged property is $15,647.38, The enclosed claim payment to you of $7,091.11 is for the actual cash value of the

---

[14] In 2020, Plaintiff paid Defendant a premium of $2687.39.

damaged property at the time of loss, less any deductible that may apply. We determined the actual cash value by deducting depreciation from the estimated repair or replacement cost. Our estimate details the depreciation applied to your loss. Based on our estimate, the additional amount available to you for replacement cost benefits (recoverable depreciation) is $6,556.27."

47.     Enclosed with the letter (as the letter notes) was a check in the amount of $7,091.11

48.     In response, on June 24, 2020, Mr. Stelly communicated with Defendant and indicated that the estimate was too low because Ridge Caps and Starter Shingle were not included in the estimate.

49.     In response to communication from Mr. Stelly concerning the first estimate, State Farm, via letter dated July 23, 2020, indicated that it had revised its estimate of Plaintiff's damages as follows: the estimate to repair or replace the damaged property was calculated to be $17,030.28, and the actual cash value of the damaged property at the time of loss, less the $2,000 deductible, was calculated to be $8,199.52. Accordingly, accompanying that letter of July 23, 2020, State Farm enclosed a check in the amount of $1,108.41, to represent the difference between the ACV calculation of July 23, 2020 and the ACV calculation of June 17, 2020.

50.     On February 11, 2021, Defendant sent to Plaintiff a check in the amount of $6,830.76 representing depreciation.

51.     Importantly, the estimated damages included Roofing Loss damages.

52.     At all times, in adjusting Plaintiff's claim and calculating the payment to be made to Plaintiff, Defendant utilized the Xactimate estimating software.

53.     For every item of roofing repair involving removal of roofing, the Xactimate system was set to default to the erroneous and cheaper demolition (DMO) labor rate rather than the proper RFG labor rate.

54.    Because Defendant's estimates and payments of roofing repair claims incorrectly use the costs of work if performed by a demolition crew, Defendant's calculation of the payment to be made to satisfy Plaintiff's claim for repair of Roofing Loss was below the ACV of such repairs, and Plaintiff and the Class have been injured as a result.

55.    Specifically, in adjusting Plaintiff's claim, State Farm, in calculating the value for "Tear off, haul and dispose of comp. shingles – laminated" used the DMO unit cost of $51.79 for 45.04 squares of roofing shingle to arrive at a figure of $2,332.62.  However, if State Farm had properly used the RFG unit cost rate of $94.46 for 45.04 square of roofing shingle, it would have arrived at a figure of $4,254.48.  Accordingly, due to the improper use of the DMO default labor costs for roofing removal items, Defendant undervalued Plaintiff's claim by $ 1,921.86.

56.    Defendant misled, concealed, or otherwise failed to disclose to Plaintiff and similarly situated policyholders that it estimated roofing repair costs and made payments for the same based not on the cost of such work if correctly and appropriately performed by properly insured contractors and/or roofing repair companies/crews but at a cost for work performed by demolition crews comprised of non-specialized, unskilled laborers.

## CLASS ACTION ALLEGATIONS

57.    This action satisfies the prerequisites for a class action pursuant to Fed. R. Civ. P. 23, as set forth below.

58.    Plaintiff brings this action individually and on behalf of the following class of similarly situated persons (the "Class") of which Plaintiff is a member:

All persons and legal entities insured under a State Farm Fire and Casualty Insurance Company homeowner policy who, from ten years prior to April 27, 2022, received from State Farm Fire and Casualty Insurance Company payments purporting to be "actual cash value" payments for roofing repair work on a home or residential structure located in Louisiana pursuant to a homeowners insurance policy claim.

59.    Excluded from the Class is Defendant, any entity in which Defendant has a controlling interest, Defendant's legal representatives, predecessors, successors, assigns, and employees, and any judicial officer presiding over this action.  Plaintiff reserves the right to modify or amend the Class definition as appropriate during the pendency of this litigation.

60.    The definition of the proposed Class is unambiguous. Plaintiff is a member of the Class he seeks to represent. Class Members can be readily identified and notified of the class action through information collected by Defendant when selling homeowners insurance policies to Plaintiffs and Class Members.

61.    **Numerosity.** Class Members are so numerous and geographically dispersed throughout Louisiana and the United States, such that joinder of all Class Members is impracticable. The members of the proposed class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that thousands of people geographically dispersed across Louisiana and the United States have been damaged by Defendant's actions. The names and addresses of the members of the proposed class are readily identifiable through records maintained by Defendant or from information readily available to Defendant.

62.    **Commonality and Fed. R. Civ. P. 23(b)(3) Predominance.** Common questions of law and fact predominate over the questions affecting only individual Class Members, including but not limited to:

a.    whether Defendant's policy language requires it to provide actual cash value of roofing repair costs performed by properly insured roofing repair companies/crews;

b.      whether insurance claim adjusters assigned to Plaintiff's and Class Members' claims utilized Xactimate software in adjusting Class Members' claims;

c.      whether the default setting in the Xactimate software for roofing repair costs is not the cost if performed by properly insured roofers, but the cost for work performed by non-specialized, unskilled demolition crews without the required workers compensation insurance for roofers;

d.      whether Defendant breached its insurance contracts with Plaintiff and Class Members by underpaying for roofing repair claims utilizing the Xactimate default setting rather than the actual cash value for such work if undertaken by a properly insured roofing company/crew and whether Plaintiff and Class Members have been damaged as a result thereof;

e.      whether Plaintiff and Class Members are entitled to equitable relief in the form of specific performance, unjust enrichment, declaratory relief or restitutionary damages;

f.      whether Plaintiff and members of the proposed class are entitled to attorney's fees; and

g.      whether Plaintiff and members of the proposed class are entitled to a declaration, as well as potential supplemental relief, under the Declaratory Judgment Act.

63.    Defendant engaged in a common course of conduct with respect to members of the proposed Class, which implicates identical or substantially similar questions of common law and

statutory violations, and any individual questions are *de minimis* compared to the significant number of common questions of law and fact.

64.     The injury suffered by each Class Member was caused by a simple and straightforward common nucleus of operative fact, consisting primarily of Defendant's failure to utilize the proper cost settings in adjusting and paying Class Members' roofing repair claims.

65.     **Typicality.** Plaintiff's claims are typical of the claims of the Class he seeks to represent. Plaintiff and the other members of the Class are all persons who are policyholders of homeowners insurance policies purchased from Defendant, who made roofing repair claims to Defendant pursuant to those policies, and who received payment based on Defendant's improper use of demolition cost settings for such roofing repair costs.

66.     **Adequacy of representation.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are competent and experienced in the prosecution of complex litigation and major nationwide and international class action lawsuits. The interests of Plaintiff are aligned with, and not in any way in conflict with or antagonistic to, the interests of the Class.

67.     **Superiority.** A class action is the superior method for the fair and efficient adjudication of Plaintiff's claims and the claims of Class Members. The relief sought by individual members of the Class is small in relation to the time and substantial expense of individual prosecution of the claims against Defendant, which means that the likelihood that individuals would separately seek and subsequently obtain redress for these harms is remote. Individual litigation of the legal and factual issues related to Defendant's conduct would unnecessarily increase the expense of all parties and the burden upon the judicial system. The class action

procedure offers the benefits of one uniform adjudication, economies of scale, and significantly reduces the burden on the judicial system that would be caused by multiple litigations.

68.  **Predominance.** A common questios of whether demolition values may be used for removal of roofing materials predominate. If this common question is resolved in favor of Plaintiff, then individual damage entitlements can be established by preparing Variation Reports using the proper RFG code and the dollar values of each Class Member's claim.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

69.  Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

70.  Defendant entered into policies of insurance with Plaintiff and Class Members. These insurance policies govern the relationship between Defendant, Plaintiff and Class Members, as well as the manner in which claims for covered losses are handled.

71.  The policies of insurance between Defendant and Plaintiff and Class Members are binding contracts under Louisiana law, supported by valid consideration in the form of premium payments in exchange for insurance coverage.

72.  Defendant drafted the insurance policies at issue, which are essentially identical in all respects material to this litigation.

73.  In order to receive ACV payments for roofing repair, Plaintiff and Class Members complied with all material provisions and performed all of their respective duties with regard to their insurance policies.

74.  Defendant breached its contractual duty to pay Plaintiff and Class Members the ACV of their roofing repair claims by unlawfully paying those claims at an artificially low and incorrect price, set not at the cost of such work if correctly and appropriately performed by properly

insured roofing repair companies/crews but at a cost for work performed by demolition crews comprised of non-specialized, unskilled laborers.

75.    As a result, Plaintiff and Class Members have been damaged in the amount of the unpaid portion of their claims.

76.    Defendant's actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiff and Class Members.

77.    In light of the foregoing, Plaintiff and Class Members are entitled to recover damages sufficient to make them whole for all amounts Defendant unlawfully withheld from their ACV payments.

78.    Plaintiff and Class Members seek any and all relief as may be permitted under Louisiana law to remedy the ongoing breaches of contract.

79.    Defendant's actions in breaching its contractual obligations to Plaintiff and Class Members benefitted and continue to benefit Defendant. Likewise, Defendant's actions damaged and continue to damage Plaintiff and Class Members.

### SECOND CAUSE OF ACTION

### (Statutory Penalties and Attorney's Fees and Costs)

80.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

81.    Pursuant to Louisiana Revised Statutes 22:1892 (A)(1), "all insurers…shall pay the amount of any claim due any insured within  thirty days of receiving satisfactory proofs of loss."

82.    Under Louisiana Revised Statutes 22:1892(B)(1), failure to make such payment within thirty (30) days after receipt of such satisfactory written proofs and demand therefore or failure to make a written offer to settle any property damage claim within thirty (30) days after receipt of satisfactory proofs of loss of that claim, when such failure is arbitrary, capricious, or

without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of  fifty percent (50%) of the amount owed, plus reasonable attorney's fees and costs, or $2,500, whichever is greater.

83.    Defendant insurer was required to pay Plaintiff and Class Members the amount of any claim due to them within thirty (30) days of receiving satisfactory proofs of loss.

84.    Defendant received satisfactory written proofs of roofing repair loss from Plaintiff and Class Members.

85.    Because Defendant paid the claims for roofing repair loss at an artificially low and incorrect price, set not at the cost of such work if correctly and appropriately performed by properly insured roofing repair companies/crews but at a cost for work performed by demolition crews comprised of non-specialized, unskilled laborers, Defendant failed to make full payment to Plaintiff and Class Members within thirty (30) days of receiving satisfactory proofs of loss.

86.    Defendants' failure is and was arbitrary, capricious, or without probable cause.

87.    Since Defendant failed to make such payments as required by Louisiana Revised Statutes 22:1892, Defendant is liable to Plaintiff and Class Members for a penalty, in addition to the amount of the loss, of  fifty percent (50%) of the amount owed, plus reasonable attorney's fees and costs, or $2,500, whichever is greater.

### THIRD CAUSE OF ACTION

### (Breach of Duty of Good Faith)

88.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

89.    Pursuant to Louisiana Revised Statutes 22:1973(A), an insurer, owes to his insured a duty of good faith and fair dealing.  The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or

both.  Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.  Furthermore, Louisiana Revised Statutes 22:1973(B) provides that if knowingly committed or performed by an insurer, the following acts constitute a breach of the insurer's duty of good faith and fair dealing: (1) misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue; (2) failing to pay a settlement within thirty days after an agreement has been reduced to writing; (3) denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured; (4) misleading a claimant as to the applicable prescription period; (5) failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause; (6) failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.

90.    Defendant owes Plaintiff and Class Members a duty of good faith and fair dealing, including an affirmative duty to adjust claims fairly and promptly, and to make a reasonable effort to settle claims.

91.    Defendant breached its duty to Plaintiff and Class Members by knowingly, among other things, failing to adjust claims fairly and properly; misleading Plaintiff and Class Members into believing that the value paid to them for their claims represented actual cash value, when, in fact, the payments were for less than actual cash value (as they were the calculated at at an artificially low and incorrect price, not reflective of the cost of such work by properly insured roofing repair companies/crews but at a cost for work performed by demolition crews comprised of non-specialized, unskilled laborers); and failing to pay the full actual cash value amount of any

claim due within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause as discussed above.

92.     In addition to any general or special damages to which Plaintiff and Class Members are entitled for breach of the imposed duty, Plaintiff and Class Members may be awarded penalties assessed against Defendant in an amount two times the damages sustained or five thousand dollars, whichever is greater.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

93.     Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

94.     Plaintiff and Class Members conferred benefit on Defendant by paying insurance premiums to Defendant in exchange for homeowners insurance coverage.

95.     Defendant has knowledge of and has retained such benefit by accepting insurance premiums from Plaintiff and Class Members and agreeing to provide to Plaintiff and Class Members homeowners insurance coverage.

96.     When Plaintiff and Class Members made roofing repair claims to Defendant pursuant to that homeowners insurance coverage, Defendant unlawfully paid those claims at an artificially low and incorrect price, set set not at the cost of such work if correctly and appropriately performed by properly insured roofing repair companies/crews but at a cost for work performed by demolition crews comprised of non-specialized, unskilled laborers.  Defendant was, thus, unjustly enriched without cause at the expense and impoverishment of Plaintiff and Class Members in that it retained the difference between what it should have paid to Plaintiff and Class Members for their claims and what it actually paid to Plaintiff and Class Members for their claims.

97.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust, inequitable, and without cause, because it was at the expense and impoverishment of Plaintiff and Class Members, and because equity and good conscience requires restitution, Defendant must pay restitution to Plaintiffs and Class Members for its unjust enrichment, as ordered by the Court.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment)

98.     Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

99.     This Court is empowered by the Declaratory Judgment Act as codified at 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to declare the rights and legal relations of parties regardless of whether or not further relief is or could be claimed.

100.     A party may seek to have insurance contracts, before or after a breach, construed to obtain a declaration of rights, status, and other legal relations thereunder adjudicated.

101.     Plaintiff and Class Members have complied with all relevant conditions precedent in their contracts.

102.     Plaintiff seeks, personally and on behalf of the Class, a declaration that Defendant's property insurance contracts require that in estimating and paying roofing repair claims, Defendant must use the actual cash values of the roofing repair work as if correctly and appropriately performed by properly insured roofing repair companies/crews not at a cost for work performed by demolition crews comprised of non-specialized, unskilled laborers.

103.     Plaintiff further seeks, personally and on behalf of the proposed Class, any and all equitable relief available under the law that the Court deems necessary and proper to the administration of justice, including, but not limited to, identifying and locating policyholders, and

notifying the same of the circumstances complained of and the restoration of their rights and remediation of their losses, and preclusion by Defendant in engaging in the conduct described herein, as may be permitted by law.

104.    Plaintiff and Class Members have suffered injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class Members request that the Court enter judgment against Defendant as follows:

A.    Certification of the action as a Class Action pursuant to FRCP 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

B.    Damages and/or restitution in the amount of unrefunded monies paid for all amounts Defendant unlawfully withheld from their actual cash value payments for roofing repair costs;

C.    Statutory penalties and attorney's fees pursuant to Louisiana Revised Statute 22:1892;

D.    Statutory penalties pursuant to Louisiana Revised Statute 22:1973;

E.    Pre-judgment and post-judgment interest;

F.    A declaratory judgment;

G.    Injunctive relief in the form of an Order prohibiting Defendant from continuing to engage in the wrongful conduct alleged herein;

H.    Such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,

**COX, COX, FILO, CAMEL & WILSON**


s/Somer G. Brown

SOMER G. BROWN (La. Bar Roll 31462)
MICHAEL K. COX (La. Bar Roll 22026)
KEVIN L. CAMEL (La. Bar Roll 21516)
RICHARD E. WILSON (La. Bar Roll 26145)
723 Broad Street
Lake Charles, LA 70601
Telephone: 337-436-6611
Facsimile: 337-436-9541
mike@coxatty.com
kevin@coxatty.com

**MURRAY LAW FIRM**
ARTHUR M. MURRAY
STEPHEN B. MURRAY, JR.
701 Poydras St., Ste. 4250
New Orleans, LA 70139
Telephone: 504-525-8100
Facsimile: 504-584-5259
amurray@murray-lawfirm.com
smurrayjr@murray-lawfirm.com

**COTCHETT, PITRE & McCARTHY, LLP**
ADAM J. ZAPALA (*pro hac vice to be filed*)
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
azapala@cpmlegal.com

**COTCHETT, PITRE & McCARTHY, LLP**
ALEXANDER E. BARNETT (*pro hac vice to be filed*)
40 Worth Street, Suite 602
New York, NY 10013
Telephone: 212-201-6820
Facsimile: 917-398-7753
abarnett@cpmlegal.com

*Attorneys for Plaintiff*